UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ALEXIS PAUPAW-MYRIE,

                                        Plaintiff,

            - against -

MOUNT VERNON CITY SCHOOL DISTRICT
and NATASHA HUNTER-MCGREGOR,

                                        Defendants.
-------------------------------------------------------------x

**OPINION & ORDER**

No. 21-CV-11237 (CS)

<u>Appearances</u>:

Alexis Paupaw-Myrie
Bronx, New York
*Pro Se Plaintiff*

Cheryl Monticciolo
Ingerman Smith, L.L.P.
Hauppauge, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

        Before the Court is the motion to dismiss of Defendants Mount Vernon City School

District (the "District") and Natasha Hunter-McGregor.  (ECF No. 21.)  For the following

reasons, the motion is GRANTED.

I.      **BACKGROUND**

        I accept as true the facts, but not the conclusions, set forth in Plaintiff's Amended

Complaint, (ECF No. 18 ("AC")), Initial Complaint, (ECF No. 2 ("IC")), and memorandum of

law, (ECF No. 25 ("P's Opp.")).  *See Washington v. Westchester Cnty. Dep't of Corr*., No. 13-

CV-5322, 2015 WL 408941, at *1 n.1 (S.D.N.Y. Jan. 30, 2015) (court may give *pro se* plaintiff

the benefit of considering facts in original complaint even if they have not been repeated in

amended complaint); *Braxton v. Nichols*, No. 08-CV-8568, 2010 WL 1010001, at *1 (S.D.N.Y.

Mar. 18, 2010) ("[A]llegations made in a *pro se* plaintiff's memorandum of law, where they are

consistent with those in the complaint, may also be considered on a motion to dismiss.").[1]

### A. <u>Factual Background</u>

Plaintiff is a Black woman and of Native American origin.  (AC ¶ 3.)  She was employed

by the District as a social studies teacher from September 2016 to June 30, 2021.  (*Id.* ¶ 1.)  She

began in 2016 as a full-time substitute teacher at the Graham School, where Defendant Dr.

Natasha Hunter-McGregor, who is not Native American, was the principal.  (*Id.* ¶ 2.)  Plaintiff

apparently thereafter was hired as a probationary teacher and received "satisfactory" or

"effective" ratings every year.  (*Id.* ¶ 5.)

In or about February 2020, Dr. Hunter-McGregor made a comment about the texture of

Plaintiff's hair – specifically, she told Plaintiff "to grow out [Plaintiff's] relaxer and insinuated

[Plaintiff's] hair should be more coarse and kinky like hers, and appeared to be jealous of

[Plaintiff's] national origin."  (*Id.* ¶ 4.)  Plaintiff also claims that Dr. Hunter-McGregor "body

shamed [her] repeatedly by commenting on [her] physical appearance and body shape," which

Plaintiff regards as "related to [her] gender."  (*Id.*)  On multiple occasions she told Plaintiff to

cover her body in front of a male assistant principal, which Plaintiff interprets as "show[ing] a

jealousy regarding [Plaintiff's] feminine appearance with regard to [her] hips and buttocks."

(*Id.*)[2]

---

[1] The Court will send Plaintiff copies of all unpublished decisions cited in this Opinion
and Order.

[2] In her opposition brief, although not in either of her complaints, Plaintiff says Dr.
Hunter-McGregor told Plaintiff her hips and butt were too big and needed to be covered up, and
that certain pants were not appropriate.  (P's Opp. at 13.)

According to Plaintiff, during both the 2017-18 and 2018-19 school years, she was approved to transfer to other schools in the District, but Dr. Hunter-McGregor allegedly blocked both transfers, telling other principals that she could not afford to lose Plaintiff.  (*Id.* ¶ 6.)

There must have been some dissatisfaction with Plaintiff's performance, however, because in June 2020, Dr. Hunter-McGregor provided, and Plaintiff signed, a *Juul* extension of probation agreement, which extended Plaintiff's tenure date until September 1, 2021.  (*Id.* ¶ 7.)[3]

Plaintiff alleges that in September 2020, Marci Tiggs, the Human Resources ("HR") Director, told Plaintiff she would be assigned as a "split teacher," meaning she would teach three classes at the Hamilton School and two classes at the Graham School for the 2020-21 school year, working at both schools each day.  (*Id.* ¶¶ 8; 24.)  That same month, Plaintiff informed her co-building representative, Michael Jernegons,[4] that staff members including herself were being "Zoom bombed" while teaching their classes remotely,[5] and he subsequently reported this to Dr. Hunter-McGregor, but Plaintiff never heard of any potential solution.  (*Id.* ¶ 9.)

Around October 5, 2020, Dr. Hunter-McGregor allegedly asked Mr. Jernegons why Plaintiff was reporting to the Graham School each day, and Mr. Jernegons informed Plaintiff that Dr. Hunter-McGregor did not ask this about other teachers who had similar split schedules.  (*Id.*

---

[3] The term "*Juul* agreement" refers to *Juul v. Bd. of Ed. of Hempstead Sch. Dist. No. 1, Hempstead*, 428 N.Y.S.2d 319, 321 (1980), *aff'd sub nom. Juul v. Bd. of Educ. of the Hempstead Sch. Dist. No. 1*, 55 N.Y.2d 648 (1981), which held that absent coercion or bad faith, "a probationary teacher who is aware that a board of education intends to deny him tenure, may validly waive his right to tenure and be employed for an additional year without acquiring tenure as a quid pro quo for re-evaluation and reconsideration of the tenure determination at the end of the extra year."  *Id.*

[4] Mr. Jernegons and Plaintiff were apparently union representatives.  (AC ¶ 29.)

[5] "Zoom bombing" is "the act of someone taking part in a video conference . . . to which they have not been invited, often with the intention of interrupting and annoying the people in the meeting."  *Zoombombing*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/zoombombing (last visited Jan. 24, 2023).

¶ 10.)  On October 8, 2020, Plaintiff reported to the Graham School, as instructed by the superintendent, and at 2:00 p.m. the assistant principal, Mark Raimondi, called Plaintiff – allegedly at Dr. Hunter-McGregor's instruction – to ask where Plaintiff's car was because she did not see it in the parking lot and needed to verify Plaintiff's attendance.  (*Id.* ¶ 11.)  On October 13, Dr. Hunter-McGregor sent Plaintiff a "condescending email, with bold and capital letters," instructing her to report to the Hamilton School, even though no other teacher was told to do the same and two other teachers started their days at another school in the District but were allowed to stay at the Graham School for remote teaching.  (*Id.* ¶ 12.)[6]  At virtual staff meetings on both October 14th and 15th, and during an October 30th union meeting, Dr. Hunter-McGregor allegedly informed Plaintiff that she would be checking in with the principal at the Hamilton School, Mr. Christian, about Plaintiff's attendance.  (*Id.* ¶¶ 13, 15-16.)

On October 15th, Dr. Hunter-McGregor directed Plaintiff to meet with her about a parental complaint that Plaintiff had removed from a Zoom class a student who would not turn on their camera or identify themselves.  (*Id.* ¶ 14.)  Plaintiff claims that this issue had been previously resolved with Mr. Raimondi and that she had removed the student due to her concerns about the recent Zoom bombing she had experienced.  (*Id.* ¶¶ 14, 17.)  On October 30th, Dr. Hunter-McGregor sent Plaintiff a counseling letter relating to the parent's complaint.  (*Id.* ¶ 17.)

---

[6] In her opposition brief, Plaintiff states that "no other non-Black teachers" received a similar email, (P's Opp. at 14), but she does not supply facts suggesting that any other Black teacher got such an email, and her AC states that no other teachers got such an email, (AC ¶ 12). I therefore conclude that no other teacher, Black or non-Black, got such an email.  Plaintiff also alleges in her opposition brief that two Caucasian teachers were allowed to begin their days at one school but stay at the Graham School for remote learning, (P's Opp. at 14), although she does not specify their race in the AC, (AC ¶ 12).  She does not explain where she started her day or when in the day she was directed to report to the Hamilton School or what the significance of the two locations is.

On November 4, 2020, Plaintiff complained to her union's president and vice president, stating she believed she was being targeted by Dr. Hunter-McGregor and subjected to a hostile work environment, which led to her having trouble sleeping and suffering from headaches, anxiety, and nausea. (*Id.* ¶ 18.) On November 11th, Plaintiff filed a harassment complaint against Dr. Hunter-McGregor with the District's HR department, alleging Dr. Hunter-McGregor had made inappropriate comments about her hair, body shape and attire. (*Id.* ¶ 19.)[7]

On November 30th, Mr. Raimondi – allegedly per Dr. Hunter-McGregor's instructions and without authority to do so – directed Plaintiff to take a rapid COVID-19 test based on her potential exposure to a staff member at the Hamilton School who had tested positive. (*Id.* ¶ 20.) In a call that night at around 10:30 p.m., Dr. Hunter-McGregor allegedly "unleashed a barrage of unprofessional comments," screamed and yelled at Plaintiff for not returning any of her calls, and interrogated Plaintiff about her possible COVID-19 exposure. (*Id.* ¶ 21.) Plaintiff believes this "unequivocal[] violat[ion of] the codes of professionalism and ethics" was retaliation for Plaintiff filing a complaint with HR on November 11th. (*Id.*) Plaintiff filed another harassment complaint with HR on December 2nd addressing the impropriety of the November 30th phone call. (*Id.* ¶ 22.)

On December 4th, Dr. Hunter-McGregor emailed Plaintiff instructing Plaintiff to meet with her on December 9th, with the right to a union representative, to discuss the COVID-19

---

[7] After stating that she complained about Dr. Hunter-McGregor's comments about hair, body shape and attire, Plaintiff states, "Therefore, I specifically made allegations of discrimination based on race, national origin, and gender discrimination, of which the District was aware." (AC ¶ 19.) That is a conclusion, not a fact. In other words, Plaintiff concludes that because she complained about comments related to hair, body shape and attire, that constituted complaining about race, origin and gender. She provides no facts from which it could be inferred that she mentioned race, origin or gender in the complaint to HR or that HR could have understood her complaint to be raising such concerns.

exposure as a potential disciplinary matter.  (*Id.* ¶ 23.)  That same day, Plaintiff emailed Ms. Tiggs in HR to complain about the number of disciplinary meetings Dr. Hunter-McGregor requested with Plaintiff.  (*Id.* ¶ 24.)

In a December 22, 2020 Zoom meeting with Plaintiff and the parent who had voiced concerns earlier in the school year, Dr. Hunter-McGregor "did not attempt to set protocol . . . with the parent," who was rude, belittling, and insulting to Plaintiff.  (*Id.* ¶ 25.)  On January 13, 2021, Plaintiff emailed Dr. Hunter-McGregor and her assistant principal stating that the same parent had sent Plaintiff harassing and insulting messages, including outside school hours.  (*Id.* ¶ 26.)  Plaintiff forwarded the conversation with the parent and asked for suggestions on how to deal with the irate parent, but got no response.  (*Id.*)  The next day, Dr. Hunter-McGregor directed Plaintiff to meet with her, the parent and Dr. Kim Smith, the Associate Superintendent for Student Support Services, and Plaintiff was instructed to hold office hours for her students.  (*Id.* ¶ 27.)  On January 20th, Plaintiff "inadvertently recorded" a meeting with the same student.  (*Id.*)  At a meeting with Dr. Hunter-McGregor and Dr. Smith on January 28th on the subject, Dr. Smith said she did not think this "inadvertent recording" warranted discipline.  (*Id.* ¶ 28.)

At a meeting on February 11th, Dr. Hunter-McGregor informed Plaintiff that she would be receiving a counseling letter about recording the student on Zoom.  (*Id.* ¶ 30.)  Dr. Hunter-McGregor also brought up union matters that had been discussed at the monthly union meeting on February 3rd, despite Plaintiff telling her that at this time, she was present as a teacher, not as a union representative.  (*Id.*)

During February or March 2021, Principal Christian told Plaintiff he was going to offer her tenure.  (*Id*. ¶ 31.)  On February 11, 2021, Plaintiff emailed Ms. Tiggs requesting to meet with HR to request a transfer away from Dr. Hunter-McGregor, who was "utilizing antagonizing

and oppressive tactics" toward her.  (*Id*. ¶ 32.)  Ms. Tiggs responded that an investigation would conclude by February 12th, but Plaintiff did not hear about the results – which she does not describe – until April 5th.  (*Id*.)

On March 24, 2021, Dr. Hunter-McGregor told Plaintiff that she was not going to recommend Plaintiff for tenure, and the next day Ms. Tiggs informed Plaintiff that she should submit a resignation letter by June 30, 2021 or would be let go.  (*Id*. ¶ 34.)  Plaintiff refused to sign a resignation letter, so was terminated effective June 30, 2021.  (*Id*.)

Plaintiff believes Dr. Hunter-McGregor (1) discriminated against her on the basis of her race, national origin, and gender based on the body shaming comments; (2) retaliated against her for filing complaints with HR in November and December 2020 through "harassing" threats of discipline and counseling letters, and by ultimately terminating her; and (3) subjected her to a hostile work environment, on an unstated basis, between June 2020 and June 2021.  (*Id*. ¶ 35.)

B. **Procedural History**

Plaintiff filed this action on December 30, 2021 against the District and Dr. Hunter-McGregor, bringing discrimination and hostile work environment claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and New York State Human Rights Law ("NYSHRL"), based on her Native American race.  (IC.)  On April 6, 2022, Defendants answered, and on April 13th, Defendants filed a pre-motion letter in anticipation of their motion to dismiss pursuant to Federal Rule of Civil Procedure 12(c).  (ECF Nos. 10, 14.)  On May 6th, the Court held a pre-motion conference, granted Plaintiff leave to amend, and set a briefing schedule.  (Minute Entry dated May 6, 2022.)  Plaintiff filed her AC on June 7, 2022, advancing the same claims and adding a retaliation claim.  (ECF No. 18.)  The instant motion under Rule 12(b)(6) followed.  (ECF Nos. 21-23, 25-26.)

II.     **LEGAL STANDARDS**

A.     **Federal Rule of Civil Procedure 12(b)(6)**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.[8]  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

---

[8] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

When deciding a motion to dismiss under Rule 12(b)(6):

> a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.  Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint.  For a document to be considered integral to the complaint, the plaintiff must rely on the terms and effect of a document in drafting the complaint; mere notice or possession is not enough.  And even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document, and it must be clear that there exist no material disputed issues of fact regarding the relevance of the document.

*United States of America ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021), *cert. denied*, 212 L. Ed. 2d 764 (U.S. May 2, 2022) (No. 21-1314).

Defendants attach to their motion papers Plaintiff's complaint to the New York State Division of Human Rights ("DHR"), the Dismissal and Notice of Rights letter issued by the Equal Employment Opportunity Commission ("EEOC"), the IC, and the AC.  (ECF Nos. 22-1, 22-2, 22-3, 22-4.)  Obviously, I can consider the IC and the AC, and I will consider Plaintiff's DHR complaint and EEOC letter because the Court may take judicial notice of such documents. *Falcon v. City Univ. of N.Y.*, 263 F. Supp. 3d 416, 423-24 (E.D.N.Y. 2017) (considering EEOC records); *Grays v. SDH Educ. W., LCC*, No. 16-CV-666, 2017 WL 2240227, at *6 (S.D.N.Y. Mar. 23, 2017) (considering DHR complaint).  Neither party disputes their authenticity, accuracy or relevance.

### B.    *Pro Se* **Plaintiffs**

Submissions by *pro se* plaintiffs are to be examined with "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010), interpreted "to raise the strongest arguments that they suggest," *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), and "held to less stringent

standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curiam*).[9]  Nevertheless, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and district courts "cannot invent factual allegations" that the plaintiff has not pleaded.  *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).

## III.  <u>DISCUSSION</u>

Plaintiff brings discrimination, retaliation, and hostile work environment claims under Title VII and § 1981.  (AC at 3-5.)  As an initial matter, Plaintiff may only bring her Title VII claims against the District because Title VII does not provide for individual liability.  *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004); *see Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir.1995) ("[I]ndividual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII."), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).  Therefore, any Title VII claims against Dr. Hunter-McGregor must be dismissed.

Additionally, Defendants are correct that when a municipality, or an individual in his official capacity, *see Hafer v. Melo*, 502 U.S. 21, 25 (1991), is sued for discrimination under § 1981, the plaintiff must show that the challenged acts were performed pursuant to a municipal custom or policy, *Patterson*, 375 F.3d at 226.  Plaintiff plainly fails to do so here.  *See Mercedes v. Westchester County*, No. 18-CV-4087, 2019 WL 1429566, at *5 (S.D.N.Y. Mar. 29, 2019)

---

[9] Plaintiff's opposition brief is significantly more professional than the submissions of most *pro se* litigants, even those who – like Plaintiff – are educated.  But I assume she did not have the assistance of counsel, and I extend her special solicitude, because a lawyer ghost-writing for a *pro se* litigant is unethical on both their parts, *see Askins v. Metro. Transit Auth.*, No. 19-CV-4927, 2020 WL 1082423, at *3 n.2 (S.D.N.Y. Mar. 5, 2020) (collecting cases), and Plaintiff may just be a gifted legal researcher, thinker and writer.

(dismissing complaint where "[p]laintiff does not allege the existence of any policy [or] any actions taken or decisions made by any County. . . policymaking officials . . . .   Plaintiff simply does not allege any factual indicia from which this Court could infer the existence of a policy or custom").   To the extent Plaintiff argues that Dr. Hunter-McGregor as a principal was a final policymaker, this argument fails.   The Second Circuit recently rejected the proposition that "a public school principal acts as a final policymaker to the extent that the ultimate harm that befell the plaintiff was under the principal's control," finding that that theory "erroneously equat[es] a principal's final decisions with a municipality's final policies . . . ."   *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 100-101 & n.7 (2d Cir. 2020).   "Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law . . . ."   *Id.* at 98.   New York Education Law § 2503(2) provides that the Board of Education of a city school district with less than 125,000 inhabitants, like the District,[10] "[s]hall prescribe such regulations and by-laws . . . for the general management, operation, control, maintenance and discipline of the schools."   Likewise, the Board of Education makes the final decision as to teacher tenure, based on the recommendation of the Superintendent.   *Id.* § 2509(2)(b).   Indeed, Plaintiff acknowledges that Dr. Hunter-McGregor only made a recommendation as to tenure, (AC ¶ 34), indicating that she was not even the final decisionmaker when it came to Plaintiff's termination, let alone a final policymaker.   Regarding the counseling memorandums, even assuming Dr. Hunter-McGregor was the final decisionmaker and her decisions were

---

[10] Article 51 of the New York Education Law (which includes § 2503(2)) applies to "the school district of each city which according to the latest federal census has less than one hundred twenty-five thousand inhabitants."   N.Y. Educ. Law § 2501.   As of 2020 federal census, Mount Vernon's population was 73,893.   *Mount Vernon City, New York*, U.S. Census Bureau, https://data.census.gov/profile/Mount_Vernon_city,_New_York?g=1600000US3649121 (last visited Jan. 30, 2023).

unreviewable, "[a] municipality's going along with discretionary decisions made by its subordinates is not a delegation to them of the authority to make policy." *Agosto*, 982 F.3d at 100.  Therefore, neither with respect to discipline nor termination was Dr. Hunter-McGregor a final policymaker whose decisions can render the District liable.

Accordingly, Plaintiff's Title VII claims remain only as to the District and her § 1981 claims remain only as to Dr. Hunter-McGregor.

A.      **Statute of Limitations**

Defendants argue that the statute of limitations limits Plaintiff's discrimination and retaliation claims under § 1981 and Title VII.  (Ds' Mem. at 14.)

"[E]mployment discrimination claims arising under . . . § 1981 are subject to the four-year federal 'catch-all' statute of limitations . . . ." *Bedden-Hurley v. N.Y.C. Bd. of Educ.*, 385 F. Supp. 2d 274, 278 (S.D.N.Y. 2005); *see James v. Countrywide Fin. Corp.*, 849 F. Supp. 2d 296, 317-18 (E.D.N.Y. 2012).  Before filing suit under Title VII, a plaintiff must exhaust her administrative remedies by filing a charge with the EEOC, or a state counterpart like DHR, within 300 days of the accrual of the claim.  *See* 42 U.S.C. § 2000e-5(e)(1) (if the claimant "has initially instituted proceedings with a State or local agency with authority to grant or seek relief . . . or to institute criminal proceedings . . . such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred").  Any claim not brought within 300 days is time barred.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109-10 (2002); *Choi v. Chem. Bank*, 939 F. Supp. 304, 310-11 (S.D.N.Y. 1996).  Recovery for discrete acts of discrimination that occur outside the applicable limitations period cannot be obtained, *Morgan*, 536 U.S. at 122, but a hostile work environment claim is

timely, even if some of the conduct at issue occurred before the limitations period, so long as an act contributing to that environment occurred within that period, *id.*

Plaintiff filed her IC in this Court on December 30, 2021, and her DHR form is dated April 8, 2021, (ECF No. 22-1 at 10), which I will assume is the date it was filed. Accordingly, any discrete acts of discrimination or retaliation under § 1981 that are alleged to have occurred prior to December 30, 2017, and any such acts under Title VII that are alleged to have occurred prior to June 12, 2020, are time-barred.

**B.    <u>Discrimination Claims</u>**

As established above, Plaintiff's § 1981 discrimination claim remains only as to Dr. Hunter-McGregor and her Title VII discrimination claim only remains as to the District.[11]  To make out a *prima facie* discrimination case, a plaintiff must show that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination."  *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009); *see Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).[12]

---

[11] In her IC and AC, Plaintiff alleges race- and national origin-based discrimination claims based on her status as a Native American, (*see* IC at 3; AC at 3), but in her papers, she states her protected class to be "Native American/Black woman," (P's Opp. at 12).  Given her *pro se* status, the Court will consider both her Native American origin and her Black race.  I will consider both federal discrimination claims together, *see Henry v. N.Y.C. Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 410 (S.D.N.Y. 2014) ("Section 1981 discrimination claims are analyzed under the same substantive standard applicable to Title VII discrimination claims."), and note that Plaintiff does not allege that either Defendant was aware of her Native American heritage. She did not check the box in either complaint for sex discrimination.

[12] At the pleading stage, a plaintiff is not required to plead a *prima facie* case, *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015), but "the elements of a *prima facie* case do provide an outline of what is necessary to render a plaintiff's employment discrimination claims for relief plausible," *Bascom v. Brooklyn Hosp.*, No. 15-CV-2256, 2015 WL 3468339, at *2 (E.D.N.Y. June 1, 2015).

As to the third prong, "[a]n adverse employment action is a materially adverse change in the terms and conditions of employment," *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008), "one which is more disruptive than a mere inconvenience or an alteration of job responsibilities," *Brown*, 673 F.3d at 150. "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004).

Plaintiff's termination is the only viable adverse employment action for purposes of her discrimination claims. Her assignment as a split teacher – a schedule shared by other teachers – amounts to nothing more than a change in assignment or responsibilities, which is not an adverse employment action. *See Rodriguez v. Coca Cola Refreshments USA, Inc*., No. 12-CV-234, 2013 WL 5230037, at *3 (E.D.N.Y. Sept. 16, 2013) ("[A]ssignments that are part of an employee's normal responsibilities are not adverse employment actions where, as here, the rate of pay and benefits remains the same.") (collecting cases); *Potash v. Fla. Union Free Sch. Dist*., 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013) ("Changes in assignments or responsibilities that do not radically change the nature of work are not typically adverse employment actions."). "A . . . reassignment may be an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career." *Edwards v. Huntington Union Free Sch. Dist*., 957 F. Supp. 2d 203, 211 (E.D.N.Y. 2013). "A plaintiff can make such a showing by demonstrating that the new assignment was materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement." *Id*. But Plaintiff makes no such allegations here.

Similarly, neither the "higher scrutiny" that Plaintiff allegedly experienced nor the counseling memos she was issued constitute adverse actions. *See Green v. Jacob & Co. Watches, Inc.*, 248 F. Supp. 3d 458, 468 (S.D.N.Y. 2017) ("[E]xcessive scrutiny, criticism, and negative evaluations of an employee's work are not materially adverse employment actions unless such conduct is accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss."); *Watson v. Geithner*, No. 11-CV-9527, 2013 WL 4028152, at *10 (S.D.N.Y. Aug. 8, 2013) ("The cases in this Circuit uniformly hold that the issuance of such [counseling] memoranda, unaccompanied by demotion, diminution of responsibilities or the like, does not constitute an adverse employment action for purposes of a discrimination claim.") (collecting cases), *report and recommendation adopted*, 2013 WL 5441748 (S.D.N.Y. Sept. 27, 2013).[13]

As to the fourth prong, under Title VII "a plaintiff must allege that the employer took adverse action against her at least in part for a discriminatory reason, and she may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Vega*, 801 F.3d at 87.  In other words, Plaintiff must allege facts from which the Court can infer an intent to discriminate on the basis of race or origin. *See Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993) (*per curiam*).  "An inference of discrimination can arise from circumstances including . . . invidious comments about others in the employee's protected group[,] more favorable treatment

---

[13] Comments regarding hair and body shape that lead to no negative consequences also do not constitute adverse actions. *See Springs v. City of N.Y.*, No. 19-CV-11555, 2020 WL 3488893, at *8 (S.D.N.Y. June 26, 2020) (because civil rights law is not a "civility code," an insensitive question about plaintiff's hair, which "ha[d] a different texture than that of his Caucasian colleagues," was not an adverse action but rather "a petty slight or trivial inconvenience," as it "never [led] to any negative consequence").

of employees not in the protected group[,] or the sequence of events leading to" the alleged

adverse action.  *Littlejohn v. City of N.Y.*, 795 F.3d 297, 312 (2d Cir. 2015).  For her § 1981

claim, Plaintiff must plausibly allege Dr. Hunter-McGregor would not have taken adverse action

against her "but for [her] race."  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S.

Ct. 1009, 1019 (2020).

Plaintiff's claims fail as to the fourth prong.  As support, Plaintiff points to Dr. Hunter-

McGregor (1) making comments about her hair, body and clothing;[14] (2) ridiculing Black staff

members with Zoom bombing; and (3) subjecting Plaintiff to higher scrutiny and generally

treating her differently than her peers, including sending Plaintiff a condescending email in

October 2020 that other teachers did not receive.  (P's Opp. at 13-14.)  These incidents,

singularly and together, are insufficient to raise an inference of race discrimination, let alone that

race was the but-for cause of Plaintiff's termination.

Dr. Hunter-McGregor's comment about Plaintiff's hair does not support an inference of

discrimination.  Plaintiff states,

> Dr. Hunter-McGregor made an inappropriate comment about the texture of my hair and
> about growing out my relaxer, which is a comment about my national origin.  She
> specifically told me to grow out my relaxer and insinuated my hair should be more coarse
> and kinky like hers, and appeared to be jealous of my national origin.

(AC ¶ 4.)[15]  While Plaintiff states these comments had to do with race and were discriminatory in

nature, her subjective belief does not support an inference of discrimination.  *See Brodt v. City of*

---

[14] Plaintiff alleges Dr. Hunter-McGregor commented on her hair around February 2020
but did not specify when she commented on Plaintiff's physical appearance and body shape.
(AC ¶ 4.)  The February 2020 comment is time barred under Title VII but can still be considered
under § 1981.  I will assume the comments about physical appearance are timely under both
statutes.

[15] The comments about body shape and clothing do not relate to race in any fashion.  I
discuss the hair comment because it apparently related to a hair texture commonly associated
with a specific race.  *See, e.g.*, *Equal Emp. Opportunity Comm'n v. Catastrophe Mgmt. Sols.*,

*N.Y.*, 4 F. Supp. 3d 562, 568 (S.D.N.Y. 2014) ("[A] plaintiff's 'feelings and perceptions of being discriminated against are not evidence of discrimination.'") (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 456 (2d Cir. 1999)); *Jones v. City of N.Y.*, No. 14-CV-0826, 2015 WL 502227, at *5 (E.D.N.Y. Feb. 5, 2015) ("Although [plaintiff] may well have subjectively believed that defendant's comments about her weave were tied to her skin color, that is plainly insufficient."). Statements that merely acknowledge Plaintiff's membership in a protected class do not support an inference of discrimination.  *See Pasha v. William M. Mercer Consulting, Inc.*, No. 00-CV-8262, 2004 WL 188077, at *4 (S.D.N.Y. Feb. 2, 2004); *Gautam v. Prudential Fin., Inc.*, No. 06-CV-3614, 2008 WL 11417411, at *7 (E.D.N.Y. Sept. 3, 2008) (collecting cases).  The comments to which Plaintiff points to here do not even do that.  If even a direct reference to a protected characteristic is not enough to raise an inference of discrimination, the indirect reference at issue here surely does not.  *See Wong v. Blind Brook-Rye Union Free Sch. Dist.*, No. 20-CV-2718, 2022 WL 17586324, at *16 (S.D.N.Y. Dec. 12, 2022).

Further, Plaintiff has not alleged that the hair remark, even if racial in nature, had any connection to the decision to terminate her.  It was made over a year before her termination, and thus is an isolated and stray remark that does not give rise to an inference of discrimination or show that race was the but-for cause of Plaintiff's termination.[16]  *See Henry*, 18 F. Supp. 3d at

---

852 F.3d 1018, 1030 (11th Cir. 2016) ("[D]iscrimination on the basis of black hair texture (an immutable characteristic) is prohibited by Title VII, while adverse action on the basis of black hairstyle (a mutable choice) is not."); *Haymon v. Metra*, No. 18-CV-848, 2020 WL 1548953, at *12 (N.D. Ill. Mar. 31, 2020) ("racial discrimination claims by Black women on the basis of their hair texture or natural hairstyles are viable . . . .").

[16] In determining whether a remark is stray, courts consider "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)."  *Henry v. Wyeth*

411 (granting motion to dismiss where "racially-charged comment about [plaintiff's] skin tone and hair color – the only act with respect to which the Amended Complaint plausibly alleges discriminatory animus" – was not linked to material adverse employment action).

Next, Plaintiff alleges that Dr. Hunter-McGregor "ridiculed Black staff members, including myself, with 'zoom bombing' while teaching classes remotely in September 2020." (P's Opp. at 14.)  This allegation appears in her opposition brief, and she cites paragraph 9 of her AC as support.  But that paragraph states only that Dr. Hunter-McGregor offered no solution after Mr. Jernegons complained that Plaintiff and others were being Zoom bombed during classes.  As Defendants correctly point out, the two allegations are entirely different and inconsistent.  (Ds' Reply at 5.)  I do not understand Plaintiff to be claiming that Dr. Hunter-McGregor was causing her teachers to be Zoom bombed by third parties.  If Plaintiff is suggesting that Dr. Hunter-McGregor Zoomed in to watch teachers teach during remote learning, just as administrators slip into classrooms to observe teachers, that would not constitute "zoom bombing" or "ridicul[ing]."  (P's Opp. at 14.)  And while Plaintiff may be suggesting that she and Black teachers were observed, she does not claim that non-Black teachers were not observed.  In any event, extending special solicitude to Plaintiff as a *pro se* litigant, this new allegation would still be insufficient to support Plaintiff's discrimination claims.  Even if Dr.

---

*Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).  Although Dr. Hunter-McGregor was Plaintiff's supervisor, and a decisionmaker to an extent, the remark had no relation in time or context to the decision-making process, and its content is not reasonably viewed as suggesting hostility to Black people or Native Americans.  "[T]he stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination . . . ."  *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001); *see Fletcher v. ABM Bldg. Value*, 775 F. App'x 8, 13 (2d Cir. 2019) (summary order) ("[S]tray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination."); *Campbell v. Alliance Nat'l Inc.*, 107 F.Supp.2d 234, 247 (S.D.N.Y.2000) ("Stray remarks . . . unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision.").

Hunter-McGregor singled out Black staff members for Zoom bombing back in September 2020 – which I do not believe is seriously alleged and in any event is not plausible – it was not until six months later that Plaintiff was informed that she would be discontinued.  (AC ¶¶ 9, 34.)  The incident fails to adequately support an inference of discrimination or that race was the but-for cause of her termination.  *Aiossa v. Bank of Am., N.A.*, No. 10-CV-1275, 2012 WL 4344183, at *2 (E.D.N.Y. Sept. 21, 2012) (where incidents are "too far removed in time," they are insufficient "to raise an inference of discrimination").

Plaintiff also alleges that Dr. Hunter-McGregor subjected her to higher scrutiny.  (P's Opp. at 14.)  She points out that (1) on October 8, 2020, Plaintiff reported to the Graham School as instructed but later that day, Assistant Principal Raimondi called her to verify her attendance, (AC ¶ 11); (2) on October 13th, Dr. Hunter-McGregor sent Plaintiff a "condescending email, with bold and capital letters," telling her to report to the Hamilton School, even though no other teacher was allegedly asked to do so, including two others (apparently Caucasian) who were allowed to stay at the Graham School for remote learning, (*id.* ¶ 12); (3) on October 14th, 15th, and 30th, Dr. Hunter-McGregor informed Plaintiff that she would be checking in with the Hamilton School principal about Plaintiff's attendance, (*id.* ¶¶ 13, 15-16); and (4) on October 15th, Dr. Hunter-McGregor asked to meet with Plaintiff to address concerns from a parent after Plaintiff had removed their student from her Zoom class for not turning on their camera or identifying themselves, (*id.* ¶ 14).

To the extent Plaintiff wishes to use this evidence to show she was treated less favorably than other similarly situated employees, her claims fail.  A plaintiff can raise an inference of discrimination "by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group."

*Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). "At the pleading stage, allegations that the plaintiff and comparators worked in the same group and were accountable to the same supervisors, but were subjected to disparate treatment may be sufficient to raise an inference of discrimination." *Pothen v. Stony Brook Univ.*, 211 F. Supp. 3d 486, 495 (E.D.N.Y. 2016). While a plaintiff "need only give plausible support to a minimal inference of discriminatory motivation," *Littlejohn*, 795 F.3d at 311, "a Title VII plaintiff must still identify at least one comparator to support a minimal inference of discrimination; otherwise the motion to dismiss stage would be too easy to bypass," *Goodine v. Suffolk Cty. Water Auth.*, No. 14-CV-4514, 2017 WL 1232504, at *4 (E.D.N.Y. Mar. 31, 2017). Identification of a "generic class of [similarly situated] white . . . employees" that allegedly received better treatment "is insufficient even at the pleadings stage." *Id.*; *see Henry*, 18 F. Supp. 3d at 408 ("Without factual amplification, the generic allegation of disparate treatment related to an unspecified class of Caucasian persons is simply not sufficient to 'nudge . . . claims across the line from conceivable to plausible,' and thus is insufficient to support [a] racial discrimination claim.") (quoting *Twombly*, 550 U.S. at 570)); *Yan v. Ziba Mode Inc.*, No. 15-CV-47, 2016 WL 1276456, at *5 (S.D.N.Y. Mar. 29, 2016) (no inference of discrimination where plaintiff "fail[ed] to plead any facts regarding how the[ ] employees' identities, experience levels, and conduct compared to Plaintiff's"); *T.P. ex rel. Patterson v. Elmsford Union Free Sch. Dist.*, No. 11-CV-5133, 2012 WL 860367, at *6 (S.D.N.Y. Feb. 27, 2012) ("[T]o withstand a motion to dismiss, a plaintiff must allege specific examples of others similarly situated who were treated more favorably.").

Here Plaintiff has not provided sufficient information about how her own treatment differed from that of similarly situated comparators. Her allegations relating to the checking of her attendance are devoid of any mention of whether Dr. Hunter-McGregor checked on other

employees, who they might be or how their attendance compared to Plaintiff's.  Similarly, Plaintiff fails to show how Dr. Hunter-McGregor's scheduling of a meeting with the concerned parent differed from how she worked with other teachers and employees.  Plaintiff's only mention of potentially similarly situated individuals is that "no other teacher was informed to [report to the Hamilton school], and two additional teachers began their day at another school in the District, but could stay at Graham school for remote learning."  (AC ¶ 12.)  This cursory mention is not enough even at the pleading stage.  Nowhere does Plaintiff provide details regarding these alleged similarly situated split-schedule teachers – "*e.g.*, who they are, what their positions or responsibilities were at [the District], how their conduct compared to [P]laintiffs' or how they were treated differently by defendants."  *Blige v. City Univ. of N.Y.*, No. 15-CV-8873, 2017 WL 498580, at *9 (S.D.N.Y. Jan. 19, 2017), *report and recommendation adopted*, 2017 WL 1064716 (S.D.N.Y. Mar. 21, 2017).  These other teachers apparently started their workday at another school and later taught remotely from the Graham School.  (AC ¶ 12.)  Plaintiff apparently taught at both the Graham and Hamilton Schools, but when in the day she did so at each and the extent to which she did so remotely is impossible to discern.  (*Id.* ¶¶ 8, 10-12.)  Without knowing where Plaintiff was supposed to be and when, where these other teachers were supposed to be and when, which classes were remote and what the significance of that fact might be, the comparison is not helpful.  Moreover, Plaintiff received the email on October 13, 2020, (*see id.* ¶ 12), long before the termination decision in March 2021, and therefore too far removed to give rise to an inference of discrimination.  *See Hasemann v. United Parcel Serv. of Am., Inc.*, No. 11-CV-554, 2013 WL 696424, at *7 (D. Conn. Feb. 26, 2013) ("Comments too remote in time and context cannot support an inference of discriminatory intent.") (collecting cases).

In short, Plaintiff fails to provide facts as to which colleagues acted comparably but were not passed over for tenure, to whom those employees reported, what their responsibilities were, and how their disciplinary histories compared to hers. "Such allegations are necessary to render plausible the inference that Plaintiff's [race], rather than any number of other considerations, played a role" in Plaintiff's termination. *Mesias v. Cravath, Swaine & Moore LLP*, 106 F. Supp. 3d 431, 437 (S.D.N.Y. 2015) (requiring information regarding plaintiff's colleagues' departments, job responsibilities and supervisors). Without such facts, and without any other evidence of discriminatory intent, Plaintiff has not raised even a minimal inference that Defendants were motivated by racial animus.

Therefore, Plaintiff's discrimination claims under § 1981 and Title VII are dismissed.[17]

**C.     Retaliation Claims**

Plaintiff also asserts retaliation claims under § 1981 and Title VII. Such claims are evaluated under the same standards. *Littlejohn*, 795 F.3d at 315 ("Retaliation claims under Title VII and § 1981 are both analyzed pursuant to Title VII principles and the *McDonnell Douglas* burden-shifting evidentiary framework.") To establish a *prima facie* case of retaliation, Plaintiff must show that: (1) she was engaged in activity protected under anti-discrimination statutes; (2)

---

[17] Had Plaintiff had alleged discrimination on the basis of sex, such a claim would fall only under Title VII, as § 1981 only covers race-based discrimination. Even under Title VII's more lenient causation prong, Plaintiff's sex discrimination claim would fail. Plaintiff only points to comments Dr. Hunter-McGregor made about Plaintiff's "physical appearance, dress [and] body shape . . . ." (P's Opp. at 13; *see* AC ¶ 4.) None of these are protected characteristics, and while comments about appearance can, depending on context, be indicative of discrimination against women, Plaintiff fails to show how the comments here – which, according to Plaintiff, exhibited admiration for or jealousy of her hair and shapeliness, and cautioned against revealing clothing – are indicative of animus toward women or connected to her ultimate termination. That a supervisor admires or is jealous of a female subordinate's hairstyle or shape, and provides feedback about appropriate workplace attire, does not plausibly suggest that that supervisor is hostile to women in the workplace.

Defendants were aware of Plaintiff's participation in the protected activity; (3) Defendants took

adverse action against Plaintiff; and (4) there is a causal connection between Plaintiff's protected

activity and the adverse action taken by Defendants.  *Fincher v. Depository Tr. & Clearing

Corp.*, 604 F.3d 712, 720 (2d Cir. 2010).  "Thus, for a retaliation claim to survive a motion for

judgment on the pleadings or a motion to dismiss, the plaintiff must plausibly allege that:  (1)

defendants discriminated—or took an adverse employment action—against him, (2) because he

has opposed any unlawful employment practice."  *Vega*, 801 F.3d at 90.

An employee's complaint qualifies as protected activity so long as the employee has a

good faith, reasonable belief (assessed in light of the totality of the circumstances) that the

employee was "opposing an employment practice made unlawful by Title VII."  *Kelly v. Howard

I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14-15 (2d Cir. 2013) (*per curiam*).

"Moreover, the employer must be able to reasonably understand that the complaint was directed

at conduct prohibited by Title VII."  *Bamba v. Fenton*, 758 F. App'x 8, 12-13 (2d Cir. 2018)

(summary order); *Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012) ("[C]omplaints

must be sufficiently specific to make it clear that the employee is complaining about conduct

prohibited by Title VII.  Generalized complaints about a supervisor's treatment are insufficient.")

To establish an adverse employment action, "a plaintiff must show that a reasonable

employee would have found the challenged action materially adverse, which . . . means it well

might have dissuaded a reasonable worker from making or supporting a charge of

discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

"Retaliation claims under Title VII and Section 1981 require a showing of but-for

causation."  *Santiago v. ACACIA Network, Inc.*, No. 22-CV-228, 2022 WL 6775835, at *8

(S.D.N.Y. Oct. 10, 2022).  A plaintiff may establish the causal connection indirectly by showing

that the protected activity was closely followed by the retaliation, or directly by showing

evidence of retaliatory animus.  *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d

Cir. 1993).

Plaintiff's alleged protected activities are her (1) November 4, 2020 complaint to her

union's president and vice president, (2) November 11, 2020 and December 2, 2020 harassment

complaints filed with the District's HR department, and (3) emails to Ms. Tiggs in HR on

December 4, 2020[18] and February 11, 2021 regarding the "excessive number of disciplinary

meetings" Dr. Hunter-McGregor had requested.  (AC ¶¶ 18-19, 22, 24, 32; P's Opp. at 18.)

Complaints to union officials, if not communicated to the employer, cannot support a retaliation

claim.  *See Grant v. N.Y. State Off. for People with Dev. Disabilities*, No. 12-CV-4729, 2013 WL

3973168, at *9 (E.D.N.Y. July 30, 2013) (complaint to union not plausibly protected activity

absent factual allegation that employer had knowledge of it).  Accordingly, Plaintiff's November

4, 2020 complaint to her union is not a protected activity.  Plaintiff's December 2, 2020

harassment complaint also does not constitute protected activity because by Plaintiff's account,

she complained that Dr. Hunter-McGregor called her late at night, yelled and screamed about

Plaintiff not answering her calls and interrogated her about her possible COVID-19 exposure,

which Plaintiff herself claims was a violation of "the codes of professionalism and ethics," not

statutorily prohibited discrimination.  (AC ¶¶ 21-22.)  *See Benn v. City of N.Y.*, 482 F. App'x

637, 639 (2d Cir. 2012) ("[Plaintiff's] complaints to his supervisors concerned disputes about . . .

the condescending manner in which one supervisor spoke to him, and a late-night phone call

from a supervisor that disturbed his sleep.  Such complaints could not reasonably have been

---

[18] In her Opposition, Plaintiff states she emailed Ms. Tiggs on December 17, 2020, (P's Opp. at 18), but in her AC she states she emailed her on December 4, 2020, (AC ¶ 24).  The difference is immaterial.

understood to protest statutorily prohibited discrimination and, thus, do not qualify as protected activity that may give rise to a claim of retaliation.")[19]  Plaintiff's emails to Ms. Tiggs are also not protected activities under Title VII.  As Plaintiff describes them, she was complaining about the excessive number of disciplinary meetings and Dr. Hunter-McGregor's general aggression toward her; she does not allege that she raised discrimination based on race or origin.  *See Johnson v. City Univ. of N.Y.*, 48 F. Supp. 3d 572, 577 (S.D.N.Y. 2014) ("[I]t is objectively unreasonable to believe that complaining about poor treatment in the workplace entirely unrelated to any trait, protected or otherwise, is a 'protected activity' under Title VII."); *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 308-09 (S.D.N.Y. 2009) ("The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally.").

As noted, *see* note 7 above, Plaintiff's allegation that her November 11, 2020 complaint about Dr. Hunter-McGregor's comments about Plaintiff's hair, body and clothing was a claim of race or origin discrimination is conclusory.  Plaintiff does not allege that she mentioned race or

---

[19] In her AC and opposition, Plaintiff attempts to contort her allegations regarding her complaint about the November 30th COVID-related call into a claim for retaliation for protesting disability discrimination, (AC ¶¶ 23, 35; P's Opp. at 5-6), which is frivoalous.  By Plaintiff's account the call did not mention any form of discrimination, let alone disability discrimination, but rather referred to Dr. Hunter-McGregor's tone of voice and demeanor.  (*Id.* ¶ 22.)  Further, being exposed to COVID-19, or even being disabled, is not a protected characteristic under Title VII, *Laface v. E. Suffolk Boces*, 349 F. Supp. 3d 126, 152 (E.D.N.Y. 2018) ("Title VII does not prohibit discrimination or retaliation on the basis of a disability."); *Risco*, 868 F. Supp. 2d at 111 ("[A] complaint about disability-related discrimination cannot form the basis of a retaliation claim under Title VII . . . ."), or § 1981, which only covers race discrimination.  Plaintiff never made, or exhausted, a claim under any federal law relating to disability discrimination.  And even under the Americans with Disabilities Act, COVID-19 exposure does not meet the definition of disability.  *See Parker v. Cenlar FSB*, No. 20-CV-2175, 2021 WL 22828, at *6 (E.D. Pa. Jan. 4, 2021).

origin, or how Defendants could reasonably have been understood her to be complaining about discrimination on those bases. But I will assume for the sake of argument that her November 11, 2020 complaint was protected activity.

Any actions before that date cannot be considered adverse employment actions as a matter of law. *See Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 262 (S.D.N.Y. 2013) ("It is well-settled that an adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before a plaintiff engaged in protected activity."), *aff'd*, 641 F. App'x 60 (2d Cir. 2016) (summary order). Plaintiff alleges that in retaliation for her November complaint, she received a late-night phone call from Dr. Hunter-McGregor, was subjected to disciplinary meetings, received a counseling letter, and was ultimately terminated. (P's Opp. at 18-19.) Plaintiff's only viable adverse action is that she was terminated from her position.

Plaintiff alleges that after submitting her November complaint, Dr. Hunter-McGregor called her late at night on November 30th and yelled at her for not returning her phone calls and questioned her about Plaintiff's potential COVID-19 exposure. (AC ¶ 21.) Plaintiff also alleges Dr. Hunter-McGregor held disciplinary meetings on several occasions. (*Id.* ¶¶ 23, 25, 27-28, 30, 33). Plaintiff does not allege or specify any actual "discipline" that resulted; instead, she states that Dr. Hunter-McGregor did not stop a parent from berating Plaintiff, (*id.* ¶ 25), continued to express her concerns with Plaintiff, (*id.* ¶ 28), and accused her (correctly) of recording a meeting with a student (which Dr. Smith found did not warrant discipline but led to a counseling letter), (*id.* ¶ 30). None of these are sufficient to support a retaliation claim, individually or collectively.

A single instance of yelling does not rise to the level of an adverse action for purposes of a retaliation claim. *Ziyan Shi v. N.Y. Dep't of State, Div. of Licensing Servs.*, 393 F. Supp. 3d

26

329, 338-39 (S.D.N.Y. 2019); *see Richards v. Dep't of Educ. of the City of N.Y.*, No. 21-CV-338,

2022 WL 329226, at *17 (S.D.N.Y. Feb. 2, 2022) (being "screamed at . . . micromanaged and

publicly derided . . . fall into the category of petty slights, minor annoyances, and simple lack of

good manners that do not constitute retaliatory action"). Likewise, counseling letters alone are

not considered materially adverse retaliatory actions. *See Tepperwien v. Entergy Nuclear*

*Operations, Inc*., 663 F.3d 556, 570 (2d Cir. 2011) ("[I]n the context of the issuance of a

'counseling memo,' . . . criticism of an employee (which is part of training and necessary to

allow employees to develop, improve and avoid discipline) is not an adverse employment

action."). Plaintiff does not specify what was written in the counseling memos, allege that they

instituted actual disciplinary action, or claim that they were discussed when she was terminated.

*See Boncoeur v. Haverstraw-Stony Point Cent. Sch. Dist*., No. 20-CV-10923, 2022 WL 845770,

at *9 (S.D.N.Y. Mar. 22, 2022) ("Further, Plaintiff provides the Court with no reason to believe

that the criticism was unwarranted or that the criticism had any tangible job consequences.");

*Sanossian v. Valley Stream Cent. High Sch. Dist.*, No. 16-CV-4697, 2022 WL 976814, at *13

(E.D.N.Y. Feb. 16, 2022) (counseling without other ramifications does not rise to required level

in retaliation case), *report and recommendation adopted*, 2022 WL 970807 (Mar. 31, 2022);

*Alexander v. Westbury Union Free Sch. Dist*., 829 F. Supp. 2d 89, 109 (E.D.N.Y. 2011)

("[R]eprimands that do not lead to materially adverse employment consequences are not

actionable forms of retaliation.").[20]

---

[20] To the extent Plaintiff alleges retaliation based on the interactions with the parent whose child she removed from the Zoom class, that claim would also fail. She received the counseling letter regarding that event before she had made any complaints. (AC ¶ 17.) To the extent Dr. Hunter-McGregor failed to prevent the parent from being nasty to Plaintiff, that does not rise to the level of materially adverse action. *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67-68 (Title VII "does not set forth a general civility code for the American workplace"

The only action alleged here that would dissuade an employee from making or supporting a claim of discrimination is Plaintiff's termination, but her retaliation claims still fail.  Plaintiff alleges no facts that would plausibly support that her November 11, 2020 complaint was the but-for cause of her termination on March 24, 2021.  Plaintiff so states, but in entirely conclusory fashion.  (AC ¶ 35.)

Temporal proximity does not support a potential causal connection, because for such an inference to be plausible, courts "uniformly hold that the temporal proximity must be very close."  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).  The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001), but courts have found that four and a half months is too long to draw a causal inference based on a temporal relationship, *see Stringfellow v. Wyckoff Heights Med. Ctr.*, No. 95-CV-3041, 1998 WL 760286, at *6 (E.D.N.Y. Sept. 9, 1998) (no causal connection found where alleged retaliatory treatment occurred "more than four months" after alleged protected activity); *Cobian v. N.Y.C.*, No. 99-CV-10533, 2000 WL 1782744, at *18 (S.D.N.Y. Dec. 6, 2000) ("Standing alone, the lapse of more than four months . . . is insufficient evidence of a causal connection."), *aff'd*, 23 F. App'x 82 (2d Cir. 2001) (summary order); *Dixon v. Int'l Fed'n of Accts.*, 416 F. App'x 107, 110-11 (2d Cir. 2011) (summary order) (lapse of four months between plaintiff's alleged protected activity and termination was insufficient evidence to establish a causal connection).

---

and its "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").

Moreover, dissatisfaction with Plaintiff's performance predated her only potentially protected complaint.  *"*There can be no inference of retaliatory animus where the adverse employment action occurred prior to the protected activity." *Pinero v. Long Island State Veterans Home*, 375 F. Supp. 2d 162, 168 (E.D.N.Y. 2005); *see Lawtone-Bowles v. City of N.Y.*, No. 17-CV-8024, 2019 WL 652593, at *5 (S.D.N.Y. Feb. 15, 2019) ("[W]here the pleadings reveal adverse disciplinary actions that were both part, and the ultimate product, of an extensive period of progressive discipline that began before any protected activity, the Court will not infer retaliatory animus based on temporal proximity alone."); *Richards v. Dep't of Educ. of the City of N.Y.*, No. 21-CV-338, 2022 WL 329226, at *17 (S.D.N.Y. Feb. 2, 2022) (that plaintiff "endured the same conduct before engaging in protected activity further belies the conclusion that retaliation was a but-for cause of this conduct").

Temporal proximity does not indirectly support the inference causation, nor are there allegations plausibly suggesting direct retaliatory animus.  Plaintiff fails to allege any facts suggesting that her protest influenced, let alone drove, the termination decision.  For example, she does not allege that anybody mentioned the complaint (or Plaintiff's race or origin) in terminating her.  Accordingly, Plaintiff's retaliation claims are dismissed.

### D.    Hostile Work Environment under Title VII

"To establish a hostile work environment under Title VII, § 1981, or § 1983, a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320-21.  Courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

29

employee's work performance." *Id*. at 321.  Plaintiff must come forward with "evidence not only that [she] subjectively perceived the environment to be hostile or abusive," but also that an objectively reasonable employee would perceive it to be so.  *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003); *see Dawson v. County of Westchester*, 351 F. Supp. 2d 176, 186 (S.D.N.Y. 2004).  Furthermore, "[a] plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class."  *Brennan v. Metro Opera Ass'n, Inc*., 192 F.3d 310, 318 (2d Cir. 1999).

Plaintiff alleges the following incidents amount to a race-based hostile work environment:  Dr. Hunter-McGregor (1) prevented her from transferring to other schools; (2) forced her to sign the June 2020 *Juul* extension of probation agreement; (3) repeatedly made comments about Plaintiff; (4) ridiculed her about "zoom bombing;" (5) subjected her to harsher scrutiny; (6) sent her a condescending email in October 2020, which she did not send to other teachers; (7) issued Plaintiff a counseling memo; (8) did not provide support when Plaintiff was insulted by a parent; (9) called her at 10:30 p.m. to yell at her; (10) held a number of disciplinary meetings and threatened disciplinary action; and (11) was "extremely aggressive."  (P's Opp. at 17.)  Defendants argue Plaintiff's claim fails because Dr. Hunter-McGregor's conduct was not severe or pervasive and even if it were, there is no plausible inference of animus based on protected characteristics.  (Ds' Reply at 6.)

These alleged events are not plausibly objectively severe or pervasive enough to constitute a hostile work environment.  *See, e.g.*, *Olin v. Rochester City Sch. Dist*., 596 F. Supp. 3d 475, 488 (W.D.N.Y. 2022) ("mean" boss who subjected plaintiff to unfair scrutiny and criticism did not plausibly create hostile work environment absent "sexist or disparaging remarks, threats, physical interactions or other egregious conduct"); *Garcia v. NYC Health &*

*Hosps. Corp.*, No. 19-CV-997, 2019 WL 6878729, at *7 (S.D.N.Y. Dec. 17, 2019) (collecting cases). But even if they were, Plaintiff plainly fails to show how any of these allegations, singularly or in the aggregate, occurred because of her membership in a protected class. "[T]he Second Circuit has made it clear that allegations of mistreatment lacking a linkage or correlation to the claimed ground of discrimination cannot form a basis for a valid hostile work environment claim." *Johnson v. Morrison & Foerster LLP*, No. 14-CV-428, 2015 WL 845723, at *7 (S.D.N.Y. Feb. 26, 2015); *see Paul v. Post Graduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 168 (E.D.N.Y. 2015) ("[I]t is . . . important in hostile work environment cases to exclude from consideration acts taken against the plaintiff that lack a linkage or correlation to the claimed ground of discrimination."). Allegations of unfair treatment directed at a member of a protected class do not establish a claim absent a basis to conclude that unfair treatment arose because of the victim's membership in that class. *See Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment by the instructors is credited, [plaintiff] has done little more than cite to his alleged mistreatment and ask the court to conclude that it must have been related to his race. This is not sufficient."); *Varughese v. Mount Sinai Med. Ctr.*, No. 12-CV-8812, 2015 WL 1499618, at *42 (S.D.N.Y. Mar. 27, 2015) ("fallacy" for plaintiff to say: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class."); *Rissman v. Chertoff*, No. 08-CV-7352, 2008 WL 5191394, at *4 (S.D.N.Y. Dec. 12, 2008) ("In essence, plaintiff alleges that because he was yelled at [by his supervisors], this must have been because [of his protected status]. Such conclusory and speculative statements are insufficient.").

      Unfortunately, the term "hostile work environment" has been interpreted by some in the general public to refer to workplaces with abusive bosses, bullying, cutthroat

competition, nastiness, or unfairness.  While those workplaces may be hostile in the colloquial sense, they do not violate the law unless they are that way because of an employee's protected characteristic.

*Estevez v. Berkeley Coll.*, No. 18-CV-10350, 2021 WL 3115452, at *19 n.21 (S.D.N.Y. July 19, 2021), *aff'd*, No. 21-1988, 2022 WL 16843460 (2d Cir. Nov. 10, 2022).  Plaintiff has plausibly alleged that Dr. Hunter-McGregor was critical of Plaintiff, but not that her dissatisfaction arose from animus based on Plaintiff's race or origin.

 Accordingly, Plaintiff's hostile work environment claim is dismissed.[21]

### E. State Law Claims

---

[21] Had Plaintiff brought a gender-based hostile work environment claim, it would also fail.  Well-intentioned comments can create a hostile work environment if a reasonable person would consider them sufficiently severe or pervasive to alter a condition of employment.  *See Torres v. Pisano*, 116 F.3d 625, 632 n.6 (2d Cir. 1997).  Plaintiff alleges that Dr. Hunter-McGregor's comments on Plaintiff's body shape and physical appearance were backhanded compliments or arose out of jealousy, but even if they did not, they were too mild and innocuous to create a hostile work environment.  *See Bailey v. Nexstar Broad., Inc.*, No. 19-CV-671, 2021 WL 848787, at *19 (D. Conn. Mar. 6, 2021) (where "the challenged comments were complimentary, innocuous, and never referred to sexual activity, never referred to sexual characteristics, and never used derogatory sexualized language," plaintiff's hostile work environment claim was dismissed).  Although Dr. Hunter-McGregor's comments may have been unwelcome, behavior that would make a reasonable person even more uncomfortable than the behavior here has been found insufficient to create a hostile work environment.  *See Feliciano v. Alpha Sector, Inc.*, No. 00-CV-9309, 2002 WL 1492139, at *8 (S.D.N.Y. July 12, 2002) (no Title VII violation where supervisor complimented plaintiff, said he wanted to date her, attempted to hug her, stated on one occasion that he wanted to "lay with" her, and kissed her after giving her after giving her a ride home, although supervisor "may well have breached the bounds of politesse" and plaintiff "may not have appreciated [his] interest in her").  Dr. Hunter-McGregor's comments about Plaintiff's allegedly revealing clothing – which Plaintiff does not allege arose out of anything other than a sincere view of proper workplace attire, *see Courtney v. Landair Transp., Inc.*, 227 F.3d 559, 564 (6th Cir. 2000) (without more, manager's warning that plaintiff's clothing was inappropriate is not sexual harassment, where no evidence it resulted from "anything more than a legitimate concern regarding appropriate dress in the workplace") – are also insufficient to create an objectively hostile or abusive work environment.  *Cf. DeSimone v. JP Morgan/Chase Bank*, No. 02-CV-7039, 2004 WL 2978011, at *6 (S.D.N.Y. Dec. 22, 2004) (alleged harasser's conduct, including leering and staring at plaintiff's body, that compelled plaintiff to dress more conservatively was, "although unquestionably offensive and inappropriate . . . not so severe or pervasive as to alter the terms and conditions of a reasonable person's employment.").

The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial.  *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  Having determined that the only claims over which this Court has original jurisdiction should be dismissed, and having considered the factors set forth in *Cohill*, I decline to exercise supplemental jurisdiction over Plaintiff's claims under the NYSHRL.  *See id.*[22]

**F.   Leave to Amend**

Leave to amend a complaint should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "[I]t is within the sound discretion of the district court to grant or deny leave to amend."  *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018).  "Leave to amend, though liberally granted, may properly be denied" for "'repeated failure to cure deficiencies by amendments previously allowed'" or "'futility of amendment,'" among other reasons.  *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended her complaint, after having the benefit of the May 6, 2022 pre-motion conference, during which the pleading problems addressed in this Opinion and Order were discussed.  (*See* Minute Entry dated May 6, 2022.)  In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient

---

[22] Plaintiff did not check the box for the New York City Human Rights Law ("NYCHRL") in either the IC or the AC, but in her opposition brief she makes arguments under that statute.  (P's Opp. at 12, 15-16.)  Any claim under the NYCHRL would be invalid, as that statute only covers discriminatory conduct within the five boroughs, and all of the activity alleged here occurred in Mount Vernon, which is in Westchester County.  *See Reyes v. Westchester Cnty. Health Care Corp.*, No. 19-CV-8916, 2021 WL 310945, at *6-7 (S.D.N.Y. Jan. 29, 2021), *aff'd*, No. 21-0410, 2021 WL 4944285 (2d Cir. Oct. 25, 2021), *cert. denied*, 142 S. Ct. 1671 (2022); *Spilkevitz v. Chase Inv. Servs. Corp.*, No. 08-CV-3407, 2009 WL 2762451, at *5 (E.D.N.Y. Aug. 27, 2009).

ground to deny leave to amend.  *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first.  Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim."); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.").

Moreover, Plaintiff has not asked to amend again or otherwise suggested that she is in possession of facts that would cure the deficiencies identified in this opinion.  *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not be given leave to amend if [she] fails to specify . . . how amendment would cure the pleading deficiencies in [the] complaint."); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice "in the absence of any indication that [plaintiff] could—or would—provide additional allegations that might lead to a different result . . . ."); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249-50 (2d Cir. 2004) (*per curiam*) (district court did not abuse its

discretion by not granting leave to amend where there was no indication as to what might have been added to make complaint viable and plaintiffs did not request leave to amend).

Accordingly, the Court declines to grant leave to amend *sua sponte*.

## IV.     <u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' motion is GRANTED.  The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 21), and close the case.

**SO ORDERED.**

Dated: January 30, 2023
White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.